FILED

OCT 30 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| Doctor STACY SEYB, M.D.,<br><br>Plaintiff - Appellee,<br>v.<br><br>MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; et al.,<br><br>Defendants,<br><br>RAUL LABRADOR,<br><br>Intervenor-Defendant - Appellant. | No. 26-5360<br><br>D.C. No.<br>1:24-cv-00244-BLW<br>District of Idaho,<br>Boise<br><br>ORDER |
| Doctor STACY SEYB, M.D.,<br><br>Plaintiff - Appellee,<br>v.<br><br>MEMBERS OF THE IDAHO BOARD OF MEDICINE; et al.,<br><br>Defendants,<br><br>ADA COUNTY PROSECUTING ATTORNEY, Jan Bennetts, in her official capacity,<br><br>Defendant - Appellant,<br><br>RAUL LABRADOR, | No. 26-5558<br>D.C. No.<br>1:24-cv-00244-BLW<br>District of Idaho,<br>Boise |

Intervenor-Defendant.

| | |
|---|---|
| M.D. Doctor STACY SEYB,<br><br>Plaintiff - Appellant,<br>v.<br><br>MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities and ADA COUNTY PROSECUTING ATTORNEY, in their official capacity,<br><br>Defendants - Appellees,<br><br>ADAMS COUNTY PROSECUTING ATTORNEY; et al.,<br><br>Defendants,<br><br>RAUL LABRADOR,<br><br>Intervenor-Defendant - Appellee. | No. 26-6068<br><br>D.C. No.<br>1:24-cv-00244-BLW<br>District of Idaho,<br>Boise |

Before: WARDLAW, BERZON, and CALLAHAN, Circuit Judges.
Concurrence by Judge WARDLAW;
Dissent by Judge BERZON

Dr. Seyb brought this action seeking to enjoin Idaho officials from prosecuting him if he performed an abortion where pregnancy posed a non-negligible risk of serious and lasting harm to the health of the pregnant woman but would not be life threatening. After a bench trial, the district court determined that "the historical record shows that our legal tradition has consistently shielded

health-preserving abortions from prosecution since the early days of the common law." The court enjoined the enforcement of the Defense of Life Act, Idaho Code § 18-622, and the Fetal Heartbeat Act, Idaho Code § 18-8804, in cases where in the physician's good faith medical judgment that continuation of the pregnancy posed a non-negligible risk "of serious and lasting harm to the health of the pregnant woman," or of "death of the pregnant woman from self-harm." The district court subsequently issued a partial stay of its injunction pending appeal, staying "enforcement of the challenged statutes against persons other than Dr. Seyb."

Idaho Attorney General, Raul R. Labrador, and the Ada County Prosecuting Attorney then filed an emergency motion for a complete stay of the district court's injunction pending appeal. We granted a temporary stay, set a briefing schedule for a response and reply, and scheduled argument on the emergency motion for September 22, 2026. Having considered the parties' filings and oral argument, we now issue a stay of the district court's injunction pending appeal.

In determining whether to issue a stay, we consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Reach Cmty. Dev. v. U. S. Dep't of Homeland Sec.*, 174 F.4th 1143, 1146 (9th Cir. 2026) (quoting *Nken v.*

*Holder*, 556 U.S. 418, 426 (2009)). "'The first two factors ... are the most critical,' and the court will address the last two factors only once the applicant has satisfied the first two factors." *Washington v. U. S. Dep't of Ed.*, 167 F.4th 1241, 1245 (9th Cir. 2026) (quoting *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs*., 137 F.4th 932, 937 (9th Cir. 2025)).

Defendants have made a strong showing of likely success on the merits. The district court reviewed the history and tradition concerning abortions and concluded that "legal tradition has consistently shielded health-preserving abortions from prosecution." However, the Supreme Court in *Dobbs v. Jackson Women's Health Organization,* 597 U.S. 215 (2022), plowed the same ground and held that "the Constitution does not confer a right to abortion." *Id*. at 292. We think it unlikely that Dr. Seyb will be able to square the district court's perspective on the history and tradition concerning abortions with the Supreme Court's perspective in *Dobbs*.

Defendants also make a strong showing of irreparable injury absent a stay. The Supreme Court in *Dobbs* held that "the authority to regulate abortion must be retuned to the people and their elected representatives." *Id*. At this time, Idaho has limited abortions to instances where "necessary to prevent the death of a pregnant woman." Idaho Code § 28-622(2)(a)(i). Indeed, Idaho Code § 18-601 states that Idaho has a "profound interest" in preserving fetal life and prefers "by all legal

means, live childbirth over abortion." Accordingly, Idaho has a strong interest in limiting abortions to those allowed under its law. This interest clearly outweighs the potential harm to Dr. Seyb of having to abide by Idaho's law pending the resolution of this appeal.

Defendants' showings of likelihood of success and irreparable injury are even stronger where the proffered reason for the abortion is the possibility of the woman committing suicide. There are other methods for preventing suicide, and Idaho's "profound interest" in preserving fetal life reasonably supports the use of those means over the termination of pregnancy.

Having determined that Defendants have made a strong showing of likelihood of success on the merits and irreparable harm absent a stay, we stay the enforcement of the district court's injunction pending appeal. Consistent with this determination, Dr. Seyb's motion to vacate the partial stay of the injunction is denied.

To facilitate further proceedings in this litigation, we recognize *Seyb v. Members of the Idaho Board of Medicine,* Appeal No. 26-6068, as a cross appeal to Appeals Nos. 26-5360 and 26-5558, and we consolidate the three appeals.

The following briefing schedule will apply to the three appeals: the first brief on cross appeal will be filed by Intervenor-Defendant-Appellant Raul Labrador and Defendant-Appellant Ada County Prosecuting Attorney Jan Bennetts

and is due on December 18, 2026; the second brief on cross appeal will be filed by Plaintiff-Cross Appellant Stacy Seyb, M.D. and is due on January 22, 2027; the third brief on cross appeal will be filed by Intervenor-Defendant-Appellant Raul Labrador, Defendant-Appellant Ada County Prosecuting Attorney Jan Bennetts, and Defendant-Cross Appellee Members of the Idaho Board of Medicine, and is due on February, 19, 2027; and the optional fourth brief on cross appeal may be filed by Plaintiff-Cross Appellant Stacy Seyb, M.D. and is due within 21 days after service of the third brief on cross appeal. Any request for an extension of time on the briefing schedule will be strongly disfavored.

FILED

OCT 30 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*Seyb v. Labrador, et al.*, Nos. 26-5360+

WARDLAW, Circuit Judge, concurring:

Four years ago, in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), a majority of the Supreme Court held that "*Roe* and *Casey* must be overruled." *Id.* at 231. The majority reasoned that the "Constitution makes no reference to abortion, and no such right is implicitly protected by any constitutional provision, including the one on which the defenders of *Roe* and *Casey* now chiefly rely—the Due Process Clause of the Fourteenth Amendment." *Id.* The majority further held that any right implicitly guaranteed by the Fourteenth Amendment "must be deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty." *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)) (internal quotations omitted). The majority then determined that the right to an abortion does not meet these criteria. *Dobbs*, 597 U.S. at 300 ("[P]rocuring an abortion is not a fundamental constitutional right because such a right has no basis in the Constitution's text or in our Nation's history.").

Thus, according to the *Dobbs* majority, *Roe* and *Casey* were "egregiously wrong" and stare decisis did not "compel" adherence to them. *Id.* at 231. The majority acknowledged that the question on which the Court granted certiorari in *Dobbs* was narrow—whether "all pre-viability prohibitions on *elective* abortions are unconstitutional." *Id.* at 234. But the majority nonetheless chose to answer the

broader question of "whether the Constitution, properly understood, confers a right to obtain an abortion." *Id.* It resisted Chief Justice Roberts's suggestion that the Court "leave for another day whether to reject any right to an abortion at all." *Id.* at 353 (Roberts, C.J., concurring in judgment). To the contrary, it determined that the best course of action was for the Court and the country to "face up to the real issue without further delay." *Id.* at 300. The majority concluded by reiterating its holding that the Constitution does not prevent "the citizens of each State from regulating or prohibiting abortion." *Id.* at 302. It emphasized that laws regulating or prohibiting abortion are subject to only rational basis review. *Id.* at 300.

In summary, *Dobbs* excoriated the reasoning of *Roe* and *Casey* and explicitly overruled them, thus closing the door on finding any constitutional right to an abortion—particularly one as vague and ill-defined as the right pressed here. Even the dissenting Justices in *Dobbs* recognized the sweeping nature of the majority's opinion. *Id.* at 360 (Justices Breyer, Sotomayor and Kagan, dissenting) ("Today, the Court . . . says that from the very moment of fertilization, a woman has no rights to speak of. . . . An abortion restriction, the majority holds, is permissible whenever rational, the lowest level of scrutiny known to the law."). In this context, it is difficult to see how we could—as the dissent suggests—resurrect a secondary holding in *Roe* and *Casey* to the effect that the Constitution protects the right to an abortion "in cases where a physician has determined, in his or her

good faith medical judgment, that continuation of the pregnancy poses a non-negligible risk of serious and lasting harm to the health of the pregnant woman." *Seyb v. Members of the Idaho Bd. of Med.*, No. 1:24-CV-00244-BLW, 2026 WL 2374617, at *30 (D. Idaho Aug. 13, 2026). And even if we could somehow revive this secondary holding, the dissent's argument that such a right survives *Roe* and *Casey* was not before the district court.

Moreover, it is not clear that Idaho's abortion ban is an outlier compared to the state abortion bans which existed during the Reconstruction Era and on which the *Dobbs* majority relied. *See Dobbs*, 597 U.S. at 248–49. Like many of those state abortion bans, Idaho's ban includes an exception for abortions necessary to "prevent the death of the pregnant woman." Idaho Code § 18-622(2)(a)(i). It also includes exceptions for abortions provided in cases involving rape or incest. *Id.* § 18-622(2)(b). And under the federal Emergency Medical Treatment and Labor Act ("EMTALA"), Idaho must permit many of the state's medical personnel to provide abortions in medical emergencies, even where Idaho's abortion ban would otherwise proscribe such abortions.[1] There may come a time when this Court is

[1] In *St. Luke's Health Sys., Ltd. v. Labrador*, 782 F. Supp. 3d 953 (D. Idaho 2025), a federal district court enjoined Idaho from enforcing its abortion ban when doing so would conflict with EMTALA's mandate to provide emergency medical care. The injunction currently only applies to St. Luke's Health System, but it requires that Idaho permit emergency medical providers to perform abortions "necessary to 'stabilize' a patient presenting with an 'emergency medical condition' as required

called upon to evaluate a state abortion ban solely under the minimal constitutional protections which remain post-*Dobbs*—including by determining whether a ban is so restrictive as to fall short of even the highly deferential standard of rational basis review. But that is not the question we decide at this juncture.

As an intermediate court of appeals, we are bound by the decisions of the Supreme Court. As such, in light of the *Dobbs* majority opinion, I join Judge Callahan in concluding that Defendants have shown a likelihood of success on the merits.

---

by EMTALA." *Id.* at 987 (quoting 42 U.S.C. § 1395dd). Idaho has not appealed this injunction and thus remains bound by it.

FILED

OCT 30 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*Seyb v. Labrador, et al.*, Nos. 26-5360+

BERZON, Circuit Judge, dissenting:

The panel majority concludes that *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), "plowed the same ground" as the district court, and so *Dobbs*'s "perspective on the history and tradition concerning abortions" likely precludes *any* constitutionally based right to abortion, even if premised on medical need. Majority at 4. I am convinced, as was the district court, that *Dobbs* does no such thing. To the extent the Supreme Court and the district court "plowed the same ground," their historical inquiries may have covered similar terrain, but those inquiries' objectives were entirely distinct.

That is because *Roe v. Wade*, 410 U.S. 113 (1993), and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), recognized two independent constitutional rights to an abortion. The first was a pregnant woman's right, premised in a constitutional privacy interest in autonomous control of her body, to be free from state interference in deciding whether to continue or terminate her pregnancy, for any reasons that mattered to her. That is the *elective abortion* constitutional right on which certiorari was granted in *Dobbs*, *see infra* at 6, and which *Dobbs* eliminated.

*Roe* and *Casey* also recognized, separately, a right to an abortion where "necessary, in appropriate medical judgment, for the preservation of the life or

health of the mother." *Casey*, 505 U.S. at 879 (quoting *Roe*, 410 U.S. at 165). The *Roe* framework permitted a state to proscribe abortion after fetal viability "*except* when [abortion] is necessary to preserve the life or health of the mother." *Roe*, 410 U.S. at 164 (emphasis added). *Roe* held that the life-or-health abortion right overcomes a state's interest in protecting fetal life. *See id. Casey* explicitly "reaffirmed" that holding,[1] while introducing a slightly modified "significant health risks" standard. *Casey*, 505 U.S. at 879–80 (joint opinion of O'Connor, Kennedy, and Souter, JJ.).[2]

---

[1] More precisely, it was *Roe*'s three-pronged "essential holding" that *Casey* "reaffirmed." *Casey*, 505 U.S. at 846. The first prong was the elective abortion right; the separate second prong articulated the life-or-health abortion right:

> First is a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure. Second is a confirmation of the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child. These principles do not contradict one another; and we adhere to each.

*Id*.

[2] The Pennsylvania statutory health exception at issue in *Casey* — which *Casey* upheld — permitted abortions only in cases of "serious risk of substantial and irreversible impairment of major bodily function." *Casey*, 505 U.S. at 879, 902. The Court read the excepted category as including "preeclampsia, inevitable abortion, and premature ruptured membrane," among other conditions. *Id.* at 880.

Commentators are divided on how best to characterize this second right. Some have framed it as within the tradition of self-defense: "*Roe v. Wade* and *Planned Parenthood of Southeastern Pennsylvania v. Casey* secure not just a previability right to abortion as reproductive choice, but also a separate postviability right to abortion as medical self-defense when pregnancy threatens a woman's life." Eugene Volokh, *Medical Self-Defense, Prohibited Experimental Therapies, and Payment for Organs*, 120 Harv. L. Rev. 1813, 1816 (2007) (footnotes omitted). Others contend the right exists when an abortion is relatively safer, medically speaking, for the mother than pregnancy. *See, e.g.*, Jack M. Balkin, *Abortion and Original Meaning*, 24 Const. Comment. 291, 294, 342–44 (2007). Yet others eschew the language of rights and instead define the holding as a "constitutional life-or-health exception." Stephen G. Gilles, Roe*'s Life-or-Health Exception: Self-Defense or Relatively-Safety?*, 85 Notre Dame L. Rev. 525, 526 (2010). I need not choose among those approaches. The important point for present purposes is that *Roe* and *Casey* held that the Constitution protects access to abortion necessary to preserve the pregnant woman's life or health, apart from the privacy-based right to *elect* an abortion for personal reasons.

Considered in isolation, brief language in the *Dobbs* opinion can be read to suggest that the Court overruled *Roe* and *Casey* in their entirety: "[T]he Constitution does not confer a right to abortion. *Roe* and *Casey* must be overruled."

*Dobbs*, 597 U.S. at 292. The panel majority posits such a wall-to-wall reading of *Dobbs*, thinking it "unlikely that Dr. Seyb will be able to square the district court's perspective . . . with the Supreme Court's." Majority at 4.

But "perspective[s]" are not legal holdings. *Id.* The district court's opinion in this case so recognized:

> *Dobbs* does not foreclose recognition of such a right. That decision explicitly addressed "elective abortions," and the majority opinion contains no analysis whatsoever of abortions performed out of medical necessity. *Dobbs*, 597 U.S. at 234. Defendants extrapolate from a few uncontextualized remarks to argue for a sweeping resolution of an argument that the Supreme Court did not even consider. To be sure, Dr. Seyb's action presents difficult questions. But Defendants cannot avoid the substance of the case through this disingenuous appeal to *Dobbs*. The medical and legal issues at stake are too profound to permit such a facile resolution.

*Seyb v. Members of the Idaho Bd. of Med.*, No. 1:24-CV-00244-BLW, 2026 WL 2374617, at *16 (D. Idaho Aug. 13, 2026). Like the district court, I am convinced, for several reasons, that *Dobbs* left open for future consideration the life-or-health abortion right separately recognized in *Roe* and *Casey*. I therefore emphatically dissent from the majority's supposition to the contrary and so from its conclusion that the defendants are likely to succeed in this case.

**I**

**A**

For starters, over the course of the *Dobbs* litigation, the constitutionality of the life-or-health abortion right was neither challenged nor addressed in the district

or circuit court. *See Jackson Women's Health Org. v. Currier*, 349 F. Supp. 3d 536 (S.D. Miss. 2018), *aff'd sub nom. Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265 (5th Cir. 2019), *rev'd and remanded*, 597 U.S. 215 (2022). Nor could it have been. The Mississippi abortion ban at issue was explicitly directed at "nontherapeutic or elective abortion-on-demand," *Dobbs*, 597 U.S. at 232 (quoting Miss. Code Ann. § 41-41-191(2)(a)); *see also id.* at 233. The Mississippi law permitted abortions in cases of "medical emergency," *Currier*, 349 F. Supp. 3d at 538, defining medical emergency, much like the Pennsylvania statute in *Casey*, as "a condition in which, on the basis of the physician's good faith clinical judgment . . . the continuation of the pregnancy will create a serious risk of substantial and irreversible impairment of a major bodily function." Miss. Code Ann. § 41-41-191(3)(j); *see also Casey*, 505 U.S. at 879. As a result, there was no justiciable issue in the *Dobbs* litigation regarding the separate life-or-health abortion holding in *Roe* and *Casey*. The plaintiffs had no reason to invoke it and did not. The defendants had no cognizable interest related to it, as their statute was consistent with it.

Consistent with the scope of the statute being challenged, the issue the defendants raised in the Supreme Court in *Dobbs*, and the issue on which certiorari was granted, was "[w]hether all pre-viability prohibitions on *elective* abortions are unconstitutional." Petition for Writ of Certiorari, *Dobbs*, 597 U.S. 215 (No. 19-

1392) (emphasis added); *Dobbs v. Jackson Women's Health Org.*, 141 S. Ct. 2619 (2021) (Mem.) (granting writ as to that question); *Dobbs*, 597 U.S. at 234; *see also id.* at 347 (Roberts, C.J., concurring in the judgment). No mention was made in the petition for certiorari of abortions performed to preserve the life or health of the mother.

This gap was not filled at the briefing stage.[3] The *Dobbs* parties neither briefed nor argued the constitutionality of the life-or-health abortion right in the Supreme Court. *See generally* Transcript of Oral Argument, *Dobbs*, 597 U.S. 215 (No. 19-1392); Brief for Petitioners, *Dobbs*, 597 U.S. 215 (No. 19-1392); Brief for Respondents, *Dobbs*, 597 U.S. 215 (No. 19-1392); Reply Brief for Petitioners, *Dobbs*, 597 U.S. 215 (No. 19-1392). None of the over one hundred amicus briefs filed in *Dobbs* substantively considered the issue.[4]

---

[3] "Only the questions set out in the petition [for a writ of certiorari], or fairly included therein, will be considered by the Court." Sup. Ct. R. 14(1)(a).

[4] One amicus brief called on the Court to "not require or in any way suggest that," "in restoring the States' authority to prohibit abortion," "the States must permit abortions sought because of the mental or psychological health of the pregnant woman, or because of undefined 'health' reasons." Brief *Amicus Curiae* of the Prolife Center at the University of St. Thomas in Support of Petitioners at 2, *Dobbs*, 597 U.S. 215 (No. 19-1392). That argument turned on an asserted potential for "widespread abuse" of such exceptions, rather than on any suggestion of the right's impropriety as a matter of constitutional law. *Id.* at 3; *accord* Brief of the Catholic Medical Association, et al., as Amicus Curiae in Support of Petitioners at 30–33, *Dobbs*, 597 U.S. 215 (No. 19-1392). Another brief, in a footnote, acknowledged that "[i]f the Court abolishes the right to elective abortion, it will need to reexamine, in an appropriate case, *Roe*'s unexplained holding that States must permit even post-viability abortions whenever necessary to preserve maternal

Nor was the gap filled in *Dobbs* itself. It *never* separately addressed the propriety of the life-or-health abortion right. The discussion in *Dobbs*'s *stare decisis* analysis covered only the elective abortion aspect of *Roe* and *Casey*. There was no mention of the separate life-or-health abortion holding as to any of the *stare decisis* factors considered. In particular, the discussion in *Dobbs* of why *Roe* and *Casey*'s privacy-based analysis lacked a basis in the Constitution did not conduct the quite different analysis that would be needed regarding whether the explicit protection of "life" in the Fourteenth Amendment includes a measure of protection for "physical injury." *Dobbs*, 597 U.S. at 268–74. *Dobbs* mentioned the life-or-health abortion right only in explicating *Roe*. *Id.* at 271. *Dobbs* then "overrule[d]" *Roe* and *Casey* generally, without mentioning the separate holding in doing so. *Id.* at 231, 292, 302.

The Supreme Court "has long stressed that 'the language of an opinion is not always to be parsed as though we were dealing with [the] language of a statute.'" *Brown v. Davenport*, 596 U.S. 118, 141 (2022) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)). Rather, "general language in judicial opinions should be read as referring in context to circumstances similar to the circumstances then

---

life *or health*." Brief of *Amicus Curiae* Professor Stephen G. Gilles in Support of Petitioners at 28 n.11, *Dobbs*, 597 U.S. 215 (No. 19-1392). That brief, although in support of the state, recognized that the life-or-health abortion issue was not before the Court and would have to be considered separately.

before the Court and not referring to quite different circumstances that the Court was not then considering." *Olivier v. City of Brandon*, 607 U.S. 552, 565 (2026) (quoting *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023)); *see also Illinois v. Lidster*, 540 U.S. 419, 424 (2004). That is a "maxim not to be disregarded," as Chief Justice Marshall long ago admonished:

> [G]eneral expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

*Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399–400 (1821) (Marshall, C. J., for the Court).

Given that the life-or-health abortion right was separately articulated in *Roe* and *Casey* and was beyond the scope of the *Dobbs* litigation, the question on which certiorari was granted, and the parties' briefing and oral argument, we should have expected the Supreme Court to speak with clarity if it nonetheless meant to abrogate that right. Read in context — which is how we read opinions — the broad *Dobbs* statement overruled the elective abortion holding discussed throughout *Dobbs*, not the separate life-or-health holding barely mentioned.

The concurrences and dissent in *Dobbs* repeatedly recognize that the majority opinion did not reach a life-or-health abortion right. One member of the five-justice majority, for example, described *Dobbs*'s holding as limited to the "basic legality of *pre-viability* abortion." *Dobbs*, 597 U.S. at 345 (Kavanaugh, J., concurring) (emphasis added). *Roe* and *Casey* expressly held the life-or-health abortion right applicable post-viability. *Casey*, 505 U.S. at 879 (quoting *Roe*, 410 U.S. at 165). Another member of the majority agreed that "[t]he Court well explains why, under our substantive due process precedents, the purported right to an abortion is not a form of '*liberty*' protected by the Due Process Clause," acknowledging that the Court did not consider whether the Due Process Clause's guarantee of *life* protects a right to certain kinds of medically necessary abortions. *Dobbs*, 597 U.S. at 330 (Thomas, J., concurring) (emphasis added); *see also id.* at 334.

Similarly, the Chief Justice, concurring only in the judgment, reprimanded the Court for "tak[ing] the dramatic step of altogether eliminating the abortion right first recognized in *Roe*." *Dobbs*, 597 U.S. at 352 (Roberts, C.J., concurring in the judgment). But he defined the abortion right at issue — the right Mississippi initially "went out of its way to make clear that it was *not* asking the Court to repudiate entirely" — as "the right to *choose* whether to terminate a pregnancy," not the right to an abortion in cases of medical need. *Id.* (emphasis added).

Mississippi's subsequent expansion of the scope of its argument led it to assert, in the Chief's words, that "a State should be able to prohibit *elective* abortions if a rational basis supports doing so." *Id.* (emphasis added). That is the "dramatic step" the Chief castigated the majority for taking — not the step of vitiating a right to life-or-health preserving abortion care.

That *Dobbs* did not address the life-or-health abortion right was noted by the dissenters, with no response on this point from the majority:

> This Court will surely face critical questions about how [its] test applies. Must a state law allow abortions when necessary to protect a woman's life and health? And if so, exactly when? How much risk to a woman's life can a State force her to incur, before the Fourteenth Amendment's protection of life kicks in? Suppose a patient with pulmonary hypertension has a 30-to-50 percent risk of dying with ongoing pregnancy; is that enough? And short of death, how much illness or injury can the State require her to accept, consistent with the Amendment's protection of liberty and equality?

*Dobbs*, 597 U.S. at 393 (joint dissent of Breyer, Sotomayor, and Kagan, JJ.). The dissenters also wrote that "States may even *argue* that a prohibition on abortion need make no provision for protecting a woman from risk of death or physical harm," *Dobbs*, 597 U.S. at 361 (emphasis added), recognizing that *Dobbs* did *not* so hold.

In short, *every* member of the Court took for granted that *Dobbs* was about the right to an elective abortion, and that right only. That the Justices interchangeably referred to a "right to elect an abortion," *id.* at 363, and a "right to

abortion" sans "elect", *id.* at 406, is yet more evidence of that shared understanding. The panel majority's conclusion otherwise simply misreads *Dobbs*.

The Supreme Court has often reminded us that "[i]t is this Court's prerogative alone to overrule one of its precedents . . . . Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) (per curiam) (quoting *United States v. Hatter*, 532 U.S. 557, 567 (2001); *Hohn v. United States*, 524 U.S. 236, 252–53 (1998)). Even if *Dobbs*'s *ratio decidendi* for rejecting an elective abortion right turns out to entail the rejection of a health-preserving abortion right as well, it remains up to the Supreme Court, not us, to so hold.

**B**

There is another, related reason I cannot read *Dobbs*'s pronouncement that "*Roe* and *Casey* must be overruled" as all-comprehensive, *Dobbs*, at 292, and so as reaching the separate *Roe*/*Casey* ruling regarding abortions performed to preserve the life or health of the mother. Were that so, *Dobbs* would have overruled *Roe* and *Casey* even for abortions necessary to preserve the *life* of the woman. On that understanding, a state could proscribe such abortions without running afoul of the Fourteenth Amendment's dictate that "No State shall . . . deprive any person of life

. . . without due process of law." U.S. Const. amend. XIV, § 1. That cannot be, and *Dobbs* certainly did not reach that result.

To the contrary: setting aside the health preservation abortions most directly at issue in this case, *Dobbs*'s history and tradition analysis makes clear beyond doubt that abortions preserving the mother's life have historically been protected. That analysis confirms that abortions performed to protect the mother's life were traditionally shielded from the abortion bans the *Dobbs* opinion discusses.

The *Dobbs* opinion puts load-bearing weight on a headcount of state criminal abortion statutes in the years before and after 1868.[5] By the majority's count, in 1868, 28 of 37 states had criminalized abortion by statute, and eight of the remaining nine did so by 1910. *Dobbs*, 597 U.S. at 248–49. All 13 extant territories between 1850 and 1919 criminalized abortion, too. *Id.* at 249. That "overwhelming consensus" — an "unbroken tradition of prohibiting abortion on pain of criminal punishment" — was the basis for *Dobbs*'s rejection of the elective abortion right. *Id.* at 249–50.

But a straw poll of the state statutes in *Dobbs*'s appendix conclusively demonstrates otherwise with regard to life-preserving abortions. *Dobbs* compiled 51 abortion statutes, one for each state, state-to-be, and the District of Columbia.

---

[5] Idaho agrees that "[t]he proper analysis centers on 'how the States regulated abortion when the Fourteenth Amendment was adopted.'"

Of those 51 statutes, 41 explicitly permitted abortions necessary to preserve the life of the mother. Of the remaining ten, nine implicitly permitted life-saving abortions by codifying the common law standards — that an abortion is criminal if undertaken "maliciously," "unlawfully," "without lawful justification," or "feloniously" — understood universally by state courts to allow mother-life-preserving abortions. One statute cited in *Dobbs*, the Colorado Territory's 1861 abortion ban, included no such exception. 1861 Terr. of Colo. Gen. Laws pp. 296–297. But an 1867 amendment, not cited in *Dobbs*, incorporated an explicit life and health exception. Colo. Rev. Stat. ch. 22 § 42 (1867). The "overwhelming consensus" of *Dobbs*'s own sources supports a fundamental right to a life-preserving abortion. How could *Dobbs* have by its broad language silently abrogated a right its reasoning affirmed?

The panel majority cannot have it both ways. It cannot adopt a literal reading of a few out-of-context sentences in *Dobbs* while, in the same breath, inferring a life-preserving abortion right that such a reading would not countenance.

As it cannot be that *Dobbs* overruled the life-preserving abortion right, it also cannot be that *Dobbs*'s broad language in a handful of sentences encompassed the health-preserving abortion right. Life and health are part and parcel of the same, separate fundamental right in *Roe* and *Casey*: to obtain medically necessary

abortion care. Unless and until the Supreme Court says otherwise, the degree to which that holding survives *Dobbs* is an open question.

Whether the life-or-health abortion right encompassed the risk of death from self-harm due to mental health issues is a more difficult question. *Casey* noted in a different context that "psychological well-being is a facet of health." *Casey*, 505 U.S. at 882. And *Roe*'s companion case, *Bolton*, noted with respect to the elective abortion right that "medical judgment may be exercised in the light of all factors — physical, emotional, psychological, familial, and the woman's age — relevant to the well-being of the patient. All these factors may relate to health." *Doe v. Bolton*, 410 U.S. 179, 192 (1973), *abrogated by Dobbs*, 597 U.S. 215 (2022). Every circuit court to consider the issue interpreted the life-or-health abortion right to extend to mental health. *See Women's Med. Pro. Corp. v. Voinovich*, 130 F.3d 187, 210 (6th Cir. 1997); *Am. Coll. of Obstetricians & Gynecologists, Pennsylvania Section v. Thornburgh*, 737 F.2d 283, 299 (3d Cir. 1984), *aff'd sub nom. Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747 (1986); *Womens Servs., P.C. v. Douglas*, 710 F.2d 465, 465 (8th Cir. 1983) (per curiam). So at this early stage of this appeal, I would proceed on the basis that the *Roe* and *Casey* life-or-health abortion right encompassed mental health too, and that *Dobbs* left open the

protection accorded such abortions.[6] Defendants have not at this juncture made a strong showing that they are likely to succeed on the merits of their contention that *Dobbs* forecloses further inquiry.

**C**

As to that further inquiry: *Dobbs did* establish the required methodology — history and tradition. The panel majority does not conduct any such inquiry. The majority regards *Dobbs* as having decided — *without* any separate history-and-tradition inquiry — that health-preserving abortions trigger no heightened constitutional protection.

The district court conducted an extensive history-and-tradition inquiry, consulting, among other sources, myriad common law authorities, ratification-era abortion statutes, contemporaneous court decisions, nineteenth century medical sources, and more recent developments in the law of abortion. In so doing, it found "strong evidence of a fundamental right to abortion when necessary to prevent serious and lasting harm to the health of the pregnant woman." *Seyb*, 2026 WL 2374617, at *26. In my view, Idaho has not made a strong showing that the district

[6] I note that I am somewhat dubious that Dr. Seyb has standing to challenge the self-harm component of the Idaho abortion ban as he has never performed an abortion on that basis. *See Seyb v. Members of the Idaho Bd. of Med.*, No. 1:24-CV-00244-BLW, 2026 WL 2374617, at *10 (D. Idaho Aug. 13, 2026). That issue has not been briefed at the stay stage, and is not addressed by the majority.

court was wrong in its methodology, the sources it referenced, or its conclusion. I highlight a few of the reasons I would at this early juncture so conclude.

In 1868, the year in which the Fourteenth Amendment was proposed and ratified, *every single American state and territory* with a criminal abortion law had some form of exception for the pregnant woman's life or health. Of the 34 states and territories that had, by 1868, enacted a criminal abortion law, three had codified express health exceptions,[7] and eight the common law standard[8] universally understood by state courts to include such an exception.[9] The

[7] Maryland, Illinois, and Colorado. *See* 1868 Md. Laws p. 315 (exempting abortions where "no other method will secure the safety of the mother"); 1867 Ill. Laws p. 89 (same for "bona fide medical or surgical purposes"); Colo. Rev. Stat. ch. 22 § 42 (1867) (same "to prevent serious and permanent bodily injury"). The Wyoming Territory's 1869 criminal abortion law included an express health exception, too, 1869 Terr. of Wyo. Gen. Laws p. 104 ("to prevent serious and permanent bodily injury"), as did Washington, D.C.'s 1901 law, § 809, 31 Stat. 1322 (1901).

[8] Massachusetts, Louisiana, New Jersey, Pennsylvania, Texas, Vermont, Nebraska, and Hawaii. *See* 1845 Mass. Acts p. 406; La. Rev. Stat. § 24 (1856); 1849 N.J. Laws, pp. 266–67; 1861 Pa. Laws pp. 404–05; 1854 Tex. Gen. Laws p. 58; 1846 Vt. Acts & Resolves pp. 34–35; Neb. Rev. Stat., Tit. 4, ch. 4, § 42 (1866); Haw. Penal Code, ch. 12, §§ 1–2 (1850). Hawaii's 1850 law incorporated the common law "maliciously, without lawful justification" standard, as well as an express exception "for the purpose of saving the life of the woman." Haw. Penal Code, ch. 12, §§ 1–2 (1850).

[9] *See, e.g.*, *Commonwealth v. Wood*, 77 Mass. 85, 89–90 (1858) (statute contemplates abortions "necessary to preserve the mother from great peril to life or health, and in good faith procured . . . with that view"); *Commonwealth v. Brown*, 121 Mass. 69, 76 (1876) (affirming statute permits abortions "in good faith for the preservation of the life or health of [the] pregnant woman"); *State v. Murphy*, 27 N.J.L. 112, 114 (1858) (purpose of statute is "to guard the health and life of the mother"); *Wells v. New Eng. Mut. Life Ins. Co.*, 43 A. 126, 126 (Pa. 1899)

remaining two-thirds of state and territorial criminal abortion laws contained express life exceptions. The critical question is whether such "life" exceptions encompassed abortions necessary to preserve the mother's *health*, defined narrowly by the district court as referring to "serious and lasting harm." *Seyb*, 2026 WL 2374617, at *15–16. The district court concluded that they did. Idaho has not made a strong showing to the contrary.

1. Start with the statutory text. Of the laws at issue, 16 permitted abortions necessary "to preserve the life" of the pregnant woman,[10] and seven allowed abortions "to save" her life.[11] In 1868, to "preserve" meant "[t]o keep or save from *injury* or destruction; to defend from evil, *harm*, *danger*, or the like."

---

(requiring a "justifiable medical reason" for abortion); *State v. Howard*, 32 Vt. 380, 393, 401 (1859) (abortion is "with lawful justification" if performed "with reference to [the pregnant woman's] life or health").

[10] Alabama, Connecticut, Florida, Indiana, Iowa, Kansas, Maine, Michigan, Missouri, New Hampshire, New York, Ohio, Oregon, Rhode Island, Washington, and Wisconsin. 1841 Ala. Acts p. 143; 1860 Conn. Pub. Acts p. 65; 1868 Fla. Laws, ch. 1637, pp. 64, 97; 1835 Ind. Laws p. 66; 1858 Iowa Acts p. 93 (codified in Iowa Rev. Laws § 4221); 1859 Kan. Laws pp. 233, 237; Me. Rev. Stat., Tit. 12, ch. 160, §§ 13–14 (1840); Mich. Rev. Stat., Tit. 30, ch. 153, §§ 33–34 (1846); Mo. Rev. Stat., Art. II, §§ 10, 36 (1835); 1849 N. H. Laws p. 708; N. Y. Rev. Stat., pt. 4, ch. 1, Tit. 2, § 9, Tit. 6, § 21 (1828); 1834 Ohio Laws pp. 20–21; Ore. Gen. Laws, Crim. Code, ch. 43, § 509 (1865); 1861 R. I. Acts & Resolves p. 133; Terr. of Wash. Stat., ch. 2, §§ 37–38, p. 81 (1854); Wis. Rev. Stat., ch. 164, § 11, ch. 169, § 58 (1858).

[11] Arizona, California, Idaho, Montana, Nevada, Virginia, and West Virginia. Howell Code, ch. 10, § 45 (1865); 1850 Cal. Stats. p. 233; 1863–1864 Terr. of Idaho Laws p. 443; 1864 Terr. of Mont. Laws p. 184; 1861 Nev. Laws p. 63; 1848 Va. Acts p. 96; W. Va. Const., Art. XI, § 8 (1862) (adopting Virginia's statutes).

*Webster's An American Dictionary of the English Language, Royal Quarto Edition, Unabridged* 1031–32 (1864) (emphasis added). To "save" meant "[t]o make safe; to procure the safety of; to preserve from *injury*, destruction or evil of any kind; to rescue from *danger*." *Id.* at 1173 (emphasis added). Both terms, "preserve" and "save," are capacious enough, in the parlance of the nineteenth century, to encompass more than just preventing predictable death. To preserve or save life mean to preserve or save life from *injury*, *harm*, or *danger*, as well as outright destruction.

2. Any narrower construction of the life exception would be anachronistic. "[I]t's a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary, contemporary, common meaning at the time [the legislature] enacted the statute." *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 284, (2018) (citation modified).

At common law, "[u]nder [medical] practice conditions of the time, 'saving life' was often inseparable from 'saving health,' making the common-law 'life exception' in practicality inextricably entangled with, and conceptually indistinguishable from, a 'health exception.'" Monica E. Eppinger, *The Health Exception*, 17 Geo. J. Gender & L. 665, 696 (2016). Those medical practice conditions persisted into the latter half of the nineteenth century, at which time "there was still little practical difference between a measure to preserve a woman's

life and to preserve her health." *Id.* at 731. Even through the first decades of the twentieth century, courts continued to acknowledge that "meager proof" of a mother's poor health — "feeling bad," for instance, or wearing "a napkin"[12] during pregnancy — might be sufficient grounds for a *life*-preserving abortion. *State v. De Groat*, 259 Mo. 364 (1914); *see also Seyb*, 2026 WL 2374617, at *21–22.

Around 1868, the concepts of "life" and "health" began occasionally to become disentangled, resulting in some statutes with express health exceptions in the years most proximate to the ratification of the Fourteenth Amendment: Illinois and Colorado in 1867, Maryland in 1868, and Wyoming in 1869. *See supra* note 7. That earlier statutes did not include such health exceptions may well reflect the inseparability of the "life" and "health" categories, not a decision by states to excise health-preserving abortions from their laws' protections. *See Seyb*, 2026 WL 2374617, at *21–22.

3. Consider also the common law background these state statutes brought with them. As the district court recognized, common law authorities broadly held that a physician's curative intent exculpated the physician of harm done to a patient. *See, e.g.*, 1 Matthew Hale, *The History of the Pleas of the Crown* 429 (1736); 4 William Blackstone, *Commentaries* at *196–97; *Seyb*, 2026 WL 2374617, at *17. Sir Matthew Hale expressly distinguished abortions administered

[12] Another term for a menstrual pad.

to "unlawfully destroy the child" from those administered "to cure [the pregnant woman] of a disease." Hale, *supra*, at 429–30; *Seyb*, 2026 WL 2374617, at *17. And at common law the right to "personal security" encompassed "a person's legal and uninterrupted enjoyment of his life, his limbs, [and] his body," as well as "[t]he preservation of a man's health from such practices as may prejudice or annoy it." 1 Blackstone, *supra*, at *125, *130; *Seyb*, 2026 WL 2374617, at *26.

Taking these considerations into account, I would hold that Idaho has not at this juncture met its burden of showing a strong likelihood of success on the merits — with an open mind about concluding otherwise after full briefing on the merits of the applicable history-and-tradition background.

**II**

There is a second, independent reason why I would not grant a stay of the district court's injunction: Idaho has not shown it will be irreparably injured during the pendency of this appeal.

"[I]f the petition [for a stay pending appeal] has not made a certain threshold showing regarding irreparable harm . . . then a stay may not issue, regardless of the petitioner's proof regarding the other stay factors." *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020) (quoting *Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011) (per curium)). A stay is, in any event, "not a matter of right, even if irreparable injury might otherwise result." *Al Otro Lado v. Wolf*, 952 F.3d 999,

1006 (9th Cir. 2020). "It is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (citation modified). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–34.

The majority credits Idaho's self-professed "profound interest . . . in limiting abortions to those allowed under its law," and so concludes Idaho suffers irreparable harm from the district court's injunction. Majority at 4–5 (quotation omitted). The majority's broad statement, it appears, joins together two of Idaho's asserted injuries: (i) an institutional injury arising from its inability to enforce its laws, and (ii) an injury, in the narrow circumstances delineated by this injunction, to its interest in protecting fetal life. I address each in turn.

**A**

Federal courts have unquestionable authority, and a solemn obligation, to enjoin state officials from enforcing a state law that violates a constitutional right. *See generally, e.g.*, *Ex parte Young*, 209 U.S. 123 (1908). And "the government . . . cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (citation modified). The scope of the asserted constitutional right to a health-preserving abortion "is at the core of this dispute, to be resolved at the

*merits* stage of this case." *Doe #1*, 957 F.3d at 1059 (emphasis added). Any harm in the interim to the state's abstract interest in enforcing its laws is not irreparable, as the state "may yet pursue and vindicate its interests in the full course of this litigation." *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (per curiam); *see also Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, 137 F.4th 932, 943 (9th Cir. 2025).

As our Circuit has acknowledged, there is authority for the idea that "a state may suffer an abstract form of harm whenever one of its acts is enjoined," but, "to the extent that is true . . . it is not dispositive of the balance of harms analysis." *Latta v. Otter*, 771 F.3d 496, 500 (9th Cir. 2014) (quoting *Indep. Living Ctr. of So. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 658 (9th Cir. 2009), *vacated and remanded on other grounds*, 565 U.S. 606 (2012) (alterations adopted)); *see also Apache Stronghold v. United States*, No. 21-15295, 2021 WL 12295173, at *7 (9th Cir. Mar. 5, 2021) (Bumatay, J., dissenting). The Supreme Court's opinion in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025) included a quotation from an in-chambers opinion by a single justice to the effect noted in *Latta*: "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)); *see also Reach Cmty. Dev. v. United States Dep't of Homeland*

*Sec.*, 174 F.4th 1143, 1148 (9th Cir. 2026). *CASA* concerned an injunction against federal enforcement of an executive order regarding immigration, and *Reach Community Development* an injunction against federal crowd control tactics meant to protect federal property. In neither case was state enforcement of a state statute at issue. More importantly, neither *CASA* nor *Reach Community* disputed *Latta*'s observation that a state's asserted harm from temporary suspension of its authority to enforce a statute pending appeal is "not dispositive of the balance of harms analysis." *Latta*, 771 F.3d at 500.

**B**

The panel majority's broad discussion of irreparable harm also suggests that the district court's injunction irreparably harms Idaho's "'profound interest' in preserving fetal life" and preference for, "by all legal means, live childbirth over abortion." Majority at 4–5 (quoting Idaho Code § 18-601). As *Dobbs* emphasizes, a state's interest in protecting fetal life is strong. *See Dobbs*, 597 U.S. at 301.

But the scope of the injunction, as limited by the district court's subsequent stay order and against the background of another recent injunction, affects that interest to a minor degree: Pending appeal, Idaho may not prohibit *one* doctor from performing abortions to ameliorate the risk of "serious and lasting harm" to his pregnant patients' health, or to alleviate the risk of his pregnant patients' death from self-harm. *Seyb v. Members of the Idaho Bd. of Med.*, No. 1:24-CV-00244-

BLW, 2026 WL 2494612, at *1 (D. Idaho Aug. 25, 2026). Further, the preliminary injunction in the Emergency Medical Treatment and Labor Act ("EMTALA") litigation for 18 months has permitted Dr. Seyb, a physician within the St. Luke's Health System, to perform abortions "necessary to stabilize a patient presenting with an emergency medical condition as required by EMTALA." *St. Luke's Health Sys., Ltd. v. Labrador* ("*St. Luke's*"), 782 F. Supp. 3d 953, 987 (D. Idaho 2025) (quotations omitted). Idaho has not appealed that preliminary injunction, so it remains in place.

There are relatively few potential abortions covered by the injunction here but not the one in *St. Luke's*, with respect to conditions that threaten the pregnant woman's physical health. The *St. Luke's* injunction covers abortions "necessary to stabilize a patient presenting with an emergency medical condition," *St. Luke's*, 782 F. Supp. 3d at 987, defined as a condition that "absen[t] . . . immediate medical attention could reasonably be expected to result in . . . serious jeopardy" to the health of the pregnant woman or a "serious impairment to bodily functions,"[13] 42

[13] EMTALA defines an "emergency medical condition" as:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

U.S.C. § 1395dd(e)(1)(A). The *Seyb* injunction covers abortions "in cases where a physician has determined, in his or her good faith medical judgment, that continuation of the pregnancy poses a non-negligible risk of serious and lasting harm to the health of the pregnant woman," *Seyb*, 2026 WL 2374617, at *30.[14]

This prohibition here is thus a narrow incursion into Idaho's interest in protecting fetal life, applying only to one doctor and only to the limited degree to which the EMTALA injunction is inapplicable to health-protective abortions. As Justice Barrett wrote in the EMTALA case, concurring in the vacatur of the Court's stay:

> As the party seeking emergency relief from this Court, Idaho bore the burden of showing that it would be 'irreparably injured' if the preliminary injunction remained in effect. The Court's grant of a stay reflected, among other things, its determination that Idaho had satisfied that burden. Now, based on the parties' representations, *it*

---

> (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
>
> (ii) serious impairment to bodily functions, or
>
> (iii) serious dysfunction of any bodily organ or part; . . . .

42 U.S.C. § 1395dd(e)(1)(A).

[14] The scope of the injunction may be broader than it should be. For instance, the "non-negligible risk" language may be looser than is supported by the history and tradition inquiry, or by the exception for life or health protective abortions upheld in *Roe* and *Casey*. *See Casey*, 505 U.S. at 902 ("serious risk of substantial and irreversible impairment of major bodily function" (quoting Tit. 18 Pa. Cons. Stat. § 3203 (1990))). But, again, that is an issue if we get to the propriety of the scope of the injunction, as the majority is now staying the injunction in its entirety.

> *appears that the injunction will not stop Idaho from enforcing its law in the vast majority of circumstances*.

*Moyle v. United States*, 144 S. Ct. 2015, 2022 (2024) (Mem.) (Barrett, J., concurring) (emphasis added and citation modified). So, too, here: Idaho's ability to enforce its abortion laws remains largely intact. *See id.* at 2022–23.

Idaho has not appealed the *St. Luke's* preliminary injunction, in place since March 2025. Nor has Idaho in this case submitted any specific evidence that it has suffered irreparable harm in the eighteen months since the *St. Luke's* injunction issued — for example, evidence of a specific instance in which Dr. Seyb might have performed an abortion covered by the injunction in this case but not the EMTALA injunction. In *Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020), we held "[t]he government . . . made a weak showing that it will suffer harm over the requisite interim period" because "[t]he injunction was in place for over three weeks before the government sought a stay pending appeal" and the government submitted no evidence of "actual burdens" it suffered as a result. *Id.* at 1007. Similarly here, the failure to appeal the *St. Luke's* injunction, and the absence of any evidence of irreparable harm as a result of the injunction, suggest that irreparable harm is unlikely "to occur during the period before th[is] appeal is decided." *Doe #1*, 957 F.3d at 1059.

### C

Finally, and critically, in summarily considering the balance of the hardships, the panel majority conspicuously overlooks that Dr. Seyb asserts the *constitutional* rights of his *patients*. We have held time and time again that "the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022) (citation modified). And "it is always in the public interest to prevent the violation of a party's constitutional rights." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (quoting *Elsasser*, 32 F.4th at 731).

Setting aside the constitutional violation, with the stay imposed by the majority in place, some women with serious pregnancy complications will during the pendency of this appeal be required to continue their pregnancies at serious, permanent risk to their health. The risk, absent the injunction, to Dr. Seyb's pregnant patients of serious and lasting harm short of death is definitionally a risk of irreparable injury. The panel majority elides such risks of permanent harm to Dr. Seyb's patients, concluding only that Idaho's "interest clearly outweighs the potential harm to *Dr. Seyb* of having to abide by Idaho's law." Majority at 5 (emphasis added). The balance of hardships flips when we correct the panel majority's omission and properly consider Dr. Seyb's patients in the hardship-balancing equation.

*          *          *

In sum, Idaho has not made a strong showing either that *Dobbs* overruled the separate holdings in *Roe* and *Casey* regarding abortions preserving the life or health of the mother or that history and tradition does not support a right to such abortions. And Idaho's demonstration of irreparable harm from the district court's injunction pending resolution of this appeal is decidedly weak, particularly when balanced against the harm to Dr. Seyb's patients. For those reasons, I respectfully, but emphatically, dissent.